HONORABLE RICHARD A. JONES

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

PACIFIC COAST SHELLFISH GROWERS ASSOCIATION,

    Plaintiff,

v.

UNITED STATES ARMY CORPS OF ENGINEERS,

    Defendant.

CASE NO. C16-193RAJ

ORDER

## I.  INTRODUCTION

This matter comes before the Court on Plaintiff Pacific Coast Shellfish Growers Association (the "Pacific Growers") and Defendant United States Army Corps of Engineers' (the "Corps") cross-motions for summary judgment. Dkt. # 4 & 13. For the reasons set forth below, the Court **DENIES** the Pacific Growers' motion and **GRANTS** the Corps' motion.

## II.  BACKGROUND

The Pacific Growers' requested a copy of the Programmatic Biological Assessment for Shellfish Activities in Washington State Inland Marine Waters (the "Shellfish PBA") from the Corps pursuant to the Freedom of Information Act ("FOIA"). The Corps prepared the Shellfish PBA – and specifically the most recent, October 2015 draft – for the U.S. Fish and Wildlife Service ("USFWS") and National Marine Fisheries Service ("NMFS") (collectively, the "Services") in connection with an ongoing

ORDER – 1

programmatic consultation with those agencies. That consultation is intended to lead to the issuance of biological opinions by those agencies pursuant to the Endangered Species Act ("ESA") and the Magnuson-Stevens Fishery Conservation and Management Act ("MSA"). *See* Dkt. # 15 (Bennett Decl.) ¶¶ 1, 3.

The Corps exercises regulatory authority over the inland marine waters of Washington State pursuant to Section 404 of the Clean Water Act ("CWA"), 33 U.S.C. § 1344, and Section 10 of the River Harbor Act of 1899, 33 U.S.C. § 403. *See also Wild Bainbridge v. Mainlander Servs. Corp.*, 544 F. Supp. 2d 1159, 1163 (W.D. Wash. 2008) (citing *Res. Invs., Inc. v. U.S. Army Corps of Eng'rs*, 151 F.3d 1162, 1166 (9th Cir. 1998)). Specifically, "Section 404 of the CWA prohibits the discharge of 'dredged or fill material' into navigable waters without a permit issued by the Corps." *See Wild Bainbridge*, 544 F. Supp. 2d at 1163 (quoting 33 U.S.C. § 1344); *see also* Dkt. # 15 (Bennett Decl.) ¶ 5.

The Corps takes the position that its permitting actions must comply with the ESA. *See* Dkt. # 15 (Bennett Decl.) ¶ 8. "Section 7 of the ESA prescribes the steps that federal agencies must take to ensure that their actions do not jeopardize endangered wildlife and flora." *Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 652 (2007). Section 7(a)(2) of the ESA requires federal agencies to consult with the Services before taking federal actions that may affect an ESA-listed species or designated critical habitat. *See* 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.01(b); *see also Butte Envtl. Council v. U.S. Army Corps of Eng'rs*, 620 F.3d 936, 940-41 (9th Cir. 2010). At the conclusion of such a consultation, the Services must prepare a written statement setting forth their opinion "and a summary of the information on which the opinion is based, detailing how the agency action affects the species or its critical habitat." *See* 16 U.S.C. § 1536(b)(3)(A); *see also* 50 C.F.R. § 402.14(h).

Additionally, the Corps must comply with the MSA for federal actions that may adversely affect Essential Fish Habitats ("EFH") in waters that it regulates. *See* Dkt. # 15

ORDER – 2

(Bennett Decl.) ¶ 9; *see also* 16 U.S.C. 1855(b)(2). When a proposed action may adversely affect an EFH, the federal agency must consult with NMFS. *See* 16 U.S.C. § 1855(b)(2); 50 C.F.R. § 600.920. EFH has been designated for several species in Washington State's inland marine waters, including for Pacific salmon, coastal pelagic species, and groundfish. *See* Dkt. # 15 (Bennett Decl.) ¶ 9. The Corps therefore cannot issue a permit for a proposed activity until a District Engineer of the Corps determines that the requirements of the EFH provisions of the MSA have been met. *See id.*

Typically, the information necessary for an evaluation required by the ESA or MSA is prepared by the permit applicant in the form of a biological evaluation or biological assessment. *See id.* ¶ 10. This information may cover whether listed species are present, habitat for such species and their prey sources, or other parameters impacts to listed or proposed species and designated or proposed critical habitat. *See id.*; *see also* 50 C.F.R. § 402.12(a). Whatever the case, after deeming it adequate, the Corps typically uses the biological assessment in assessing the project, determining whether the project may affect listed species or their critical habitat or if it will adversely EFH. *Id.* If the Corps determines that a permit application will not have an effect, then no further consultation with the Services is typically necessary. *See* 50 C.F.R. § 402.14(b)(1). If the Corps determines that a proposed project will affect an endangered species, critical habitat, or the like, then it must consult with the relevant Service. *See id.*; *see also* Dkt. # 15 (Bennett Decl.) ¶ 10.

In determining whether a formal consultation is necessary, however, the regulations permit agencies to informally consult with the relevant Service. *See* 50 C.F.R. § 402.13(a). During such an informal consultation, "the Service may suggest modifications to the action that the Federal agency and any applicant could implement to avoid the likelihood of adverse effects to listed species or critical habitat." *Id.* § 402.13(b). Ultimately, if it is determined that an agency action may affect a listed species or critical habitat, a formal consultation is required. *See id.* § 402.14(a). During such a

ORDER – 3

formal consultation, the Service typically must prepare a biological opinion. *See id.* § 402.14(g)(4), (h), (l)(1).

To streamline its permitting process, agencies may engage in "programmatic consultation" which "concerns planning documents and other scenarios in which an agency is preparing to undertake a number of later, similar actions, the specifics of which have not yet been defined." *See Ctr. for Sierra Nevada Conservation v. U.S. Forest Serv.*, 832 F. Supp. 2d 1138, 1144 (E.D. Cal. 2011) (citing *Gifford Pinchot Task Force v. U.S. Fish and Wildlife Serv.*, 378 F.3d 1059, 1062 (9th Cir. 2004); *Pac. Coast Fed'n of Fishermen's Ass'ns v. Nat'l Marine Fisheries Serv.*, 482 F. Supp. 2d 1248, 1267 (W.D. Wash. 2007); *Buckeye Forest Council v. U.S. Forest Serv.*, 378 F. Supp. 2d 835, 843–44 (S.D. Ohio 2005)). In doing so, the Corps generates a programmatic biological assessment ("PBA") without reference to any specific permit applications and the Services generate a programmatic biological opinion ("PBO"). *See* Dkt. # 15 (Bennett Decl.) ¶ 12. Ultimately, through this process, after the issuance of a PBO, if a proposed work activity in a permit application meets the activities evaluated considered under the scope of the PBO, then the Corps may rely on the PBO without any further consultation requirements. *See id.* If a proposed work activity in a permit application does not fall under the scope of the PBO, then the Corps must conduct the consultation process on an individual basis with the Services. *See id.*

The Seattle District of the Corps decided to go through a programmatic process with the Services after receiving more than 1000 permit applications for shellfish activities since 2007.[1] *See id.* ¶ 15. In 2013, to relieve its workload and streamline the permitting process, the Seattle District began pursuing a programmatic consultation with

---

[1] Different permit types may be used to authorize shellfish activities. Dkt. # 15 (Bennet Decl.) ¶ 13. One such permit is nationwide permit ("NWP") 48. *Id.* The Corps issued a new set of NWPs in March 2012 which superseded the 2007 version of the NWPs. *Id.* ¶ 14. The Seattle District has received nearly 850 applications under the 2012 version of NWP 48 under a programmatic consultation completed in 2011. *Id.* ¶ 15. However, in February 2013, the Corps and the Services determined that the 2011 consultation only covered activities under the 2007 version of NWP 48, requiring individual consultations for activities covered by NWP 48. *Id.*

ORDER – 4

the Services for a range of shellfish activities in Washington State marine waters rather than only for NWP 48. *Id.* ¶ 16. The Corps and Services began preparing the Shellfish PBA through a process called the Standard Local Operating Procedures for Endangered Species. *Id.* ¶ 17. The Corps and the Services have, apparently, tried to keep their work confidential. *Id.* However, they have at times sought input from stakeholders. *See id.*

The Corps has revised the Shellfish PBA several times since starting the process. *See id.* ¶¶ 20, 23. And the Services and Corps have routinely corresponded and met to discuss the Shellfish PBA. *See id.* ¶ 20. The Corps also involved the Environmental Protection Agency ("EPA") in the process. *See id.* ¶ 21. Ultimately, these consultations resulted in the October 30, 2015 version of the Shellfish PBA at issue here. *Id.* ¶ 23. Individual sections of the Shellfish PBA were distributed to the Services throughout the process as those sections were exchanged among the members of the technical teams for review and comment. *Id.* ¶ 24. The consultation process is ongoing. *Id.* ¶ 25.

The Pacific Growers made their FOIA request to the Corps on November 20, 2015, seeking a copy of the October 2015 draft Shellfish PBA. *See* Dkt. # 6 (Carr Decl.) Ex. 1 at 2-3. The Corps denied the Pacific Growers' request on December 22, 2015 stating that the document as being withheld as predecisional because the Section 7 ESA consultation had not completed. *See id.* Ex. 4 at 11. The Pacific Growers filed an administrative appeal the next day. *See id.* Ex. 5. The Corps did not act on the appeal and, ultimately, the Pacific Growers filed this suit.

### III. LEGAL STANDARD

Summary judgment is appropriate if there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Where the moving party will have the burden of proof at trial, it must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party.

ORDER – 5

*Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007). On an issue where the nonmoving party will bear the burden of proof at trial, the moving party can prevail merely by pointing out to the district court that there is an absence of evidence to support the non-moving party's case. *Celotex Corp.*, 477 U.S. at 325. If the moving party meets the initial burden, the opposing party must set forth specific facts showing that there is a genuine issue of fact for trial in order to defeat the motion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). The court must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 150-51 (2000).

However, "[t]he usual summary judgment standard does not extend to FOIA cases because the facts are rarely in dispute and courts generally need not resolve whether there is a genuine issue of material fact." *Shannahan v. I.R.S.*, 637 F. Supp. 2d 902, 912 (W.D. Wash. 2009) (citing *Minier v. Cent. Intelligence Agency*, 88 F.3d 796, 800 (9th Cir. 1996)). Instead, courts often follow a two step inquiry. *Id.*

The first step requires the Court to "determine whether the agency has met its burden of proving that it fully discharged its obligations under FOIA." *Los Angeles Times Commc'ns, LLC v. Dep't of Army*, 442 F. Supp. 2d 880, 893 (C.D. Cal. 2006) (citing *Zemansky v. EPA*, 767 F.2d 569, 571 (9th Cir. 1985)). An agency can demonstrate this by showing that it has conducted a search reasonably calculated to uncover all relevant documents. *Id.* "An agency can demonstrate the adequacy of its search through 'reasonably detailed, nonconclusory affidavits submitted in good faith.'" *Hamdan v. U.S. Dep't of Justice*, 797 F.3d 759, 770 (9th Cir. 2015) (quoting *Zemansky*, 767 F.2d at 571).

If the agency meets its burden at the first step, then the Court "must determine 'whether the agency has proven that the information that it did not disclose falls within one of the nine FOIA exemptions.'" *Shannahan*, 637 F. Supp. 2d at 912 (quoting *Los Angeles Times*, 442 F. Supp. 2d at 894). "The agency bears the burden of justifying the

ORDER – 6

withholding of information under an exemption." *Prudential Locations LLC v. U.S. Dep't of Housing and Urban Dev.*, 739 F.3d 424, 429 (9th Cir. 2013) (citing 5 U.S.C. § 552(a)(4)(B)). "To carry their summary judgment burden, agencies are typically required to submit an index and 'detailed public affidavits' that, together, 'identify[] the documents withheld, the FOIA exemptions claimed, and a particularized explanation of why each document falls within the claimed exemption.'" *Yonemoto v. Dep't of Veterans Affairs*, 686 F.3d 681, 688 (9th Cir. 2011) (quoting *Lion Raisins v. Dep't of Agric.*, 354 F.3d 1072, 1082 (9th Cir. 2004)). Such submissions must come from affiants who are knowledgeable about the information sought and must be detailed enough to allow the Court to make an independent assessment of the agency's claim of exemption. *See id.* Of course, "[b]ecause FOIA's purpose is to encourage disclosure, its exemptions are to be narrowly construed." *Carter v. U.S. Dep't of Commerce*, 307 F.3d 1084, 1088 (9th Cir. 2002) (citing *Dep't of Justice v. Julian*, 486 U.S. 1, 8 (1988); *Assembly of Cal. v. U.S. Dep't of Commerce*, 968 F.2d 916, 919 (9th Cir. 1992)).

Finally, even if the agency satisfies this test, it ordinarily "must still disclose any reasonably segregable portions of the withheld documents." *Shannahan*, 637 F. Supp. 2d at 912. "The burden is on the agency to establish that all reasonably segregable portions of a document have been segregated and disclosed." *Pac. Fisheries, Inc. v. United States*, 539 F.3d 1143, 1148 (9th Cir. 2008) (citing 5 U.S.C. § 552(a)(4)(B), (b)).

## IV. DISCUSSION

a. <u>Whether the Shellfish PBA is Covered by Exemption 5 and the Deliberative Process Privilege</u>

The Corps invoked FOIA Exemption 5 to withhold the October 2015 draft Shellfish PBA. *See* Dkt. # 14 (Hynes Decl.) ¶ 8. Exemption 5 applies to "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency." 5 U.S.C. § 552(b)(5). In other words, "Exemption 5 allows the government to withhold documents that fall within a

ORDER – 7

recognized litigation privilege." *Kowack v. U.S. Forest Serv.*, 766 F.3d 1130, 1135 (9th Cir. 2014) (citing *Dep't of Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 8 (2001)).

The deliberative process privilege is one of those privileges and the Corps has attempted to assert it here. *See* Dkt. # 13 at 12. The deliberative process privilege "covers 'documents reflecting advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated.'" *Kowack*, 766 F.3d at 1135 (quoting *Carter*, 307 F.3d at 1089). This privilege "shields certain intra-agency communications from disclosure to 'allow agencies freely to explore possibilities, engage in internal debates, or play devil's advocate without fear of public scrutiny.'" *Lahr v. Nat'l Transp. Safety Bd.*, 569 F.3d 964, 979 (9th Cir. 2009) (quoting *Assembly of Cal.*, 968 F.2d at 920). For a document to fall within this privilege, it must be both "predecisional" and "deliberative." *Id.*; *see also Kowack*, 766 F.3d at 1135 (quoting *Maricopa Audubon Soc'y v. U.S. Forest Serv.*, 108 F.3d 1089, 1093 (9th Cir. 1997)).

"Predecisional documents are those 'prepared in order to assist an agency decisionmaker in arriving at his decision, and may include recommendations, draft documents, proposals, suggestions, and other subjective documents which reflect the personal opinions of the writer rather than the policy of the agency.'" *Our Children's Earth Found. v. Nat'l Marine Fisheries Serv.*, 85 F. Supp. 3d 1074, 1087 (N.D. Cal. 2015) (quoting *Assembly of Cal.*, 968 F.2d at 920). The decision making agency need not be the same agency as the preparing the one preparing the document. *See Renegotiation Bd. v. Grumman Aircraft Eng'g Corp.*, 421 U.S. 168, 188 (1975) ("Congress plainly intended to permit one agency possessing decisional authority to obtain written recommendations and advice from a separate agency not possessing such decisional authority without requiring that the advice be any more disclosable than similar advice received from within the agency"). Of course, "[m]aterial which predates a decision

ORDER – 8

chronologically, but did not contribute to that decision, is not predecisional in any meaningful sense." *Carter*, 307 F.3d at 1089 (quoting *Assembly of Cal.*, 968 F.2d at 921).

There does not appear to be a significant dispute that the Shellfish PBA is predecisional. *See* Dkt. # 16. As the Corps rightly notes, draft documents often fall under this prong, though they are not always predecisional.[2] *See e.g. Nat'l Wildlife Fed. v. U.S. Forest Serv.*, 861 F.2d 1114, 1120 (9th Cir. 1988) (finding that draft forest plans and draft environmental impact statements were predecisional because they were "merely working drafts subject to revision" and would be released once they were in their final form); *Kortlander v. Bureau of Land Mgmt.*, 816 F. Supp. 2d 1001, 1012 (D. Mont. 2011) (holding that "[d]raft documents subject to revision or containing proposed changes fall well within the deliberative process privilege" and protecting draft documents planning an undercover operation and investigation); *see also Fox News Network, LLC v. U.S. Dep't of Treasury*, 911 F. Supp. 2d 261, 275 (S.D.N.Y. 2012) (citing *New York Times Co. v. U.S. Dep't of Def.*, 499 F. Supp. 2d 501, 515 (S.D.N.Y. 2007)); *Nevada v. U.S. Dep't of Energy*, 517 F. Supp. 2d 1245, 1262-65 (D. Nev. 2007).

Moreover, there is little doubt that the Shellfish PBA is predecisional to the issuance of a PBO.[3] As the Corps convincingly argues, the decisionmakers in this particular process are the Services, not the Corps. *See* Dkt. # 13 at 14-15. Indeed, the implementing regulations make clear that a federal agency must prepare a biological assessment before the Services can initiate a formal consultation. *See* 50 C.F.R. § 402.14(c). And, in issuing a biological opinion, the Services are directed to review the

---

[2] "[D]rafts are not presumptively privileged." *Judicial Watch, Inc. v. U.S. Postal Serv.*, 297 F. Supp. 2d 252, 260 (D.D.C. 2004) (citing *Arthur Anderson & Co. v. I.R.S.*, 679 F.2d 254, 257 (D.C. Cir. 1982)).

[3] Neither party addresses the issue, but the Corps has certainly identified the decision making process to which the Shellfish PBA contributed and to which it is predecisional: the creation of a PBO by the Services. *See Nat'l Res. Def. Council v. U.S. Dep't of Def.*, 388 F. Supp. 2d 1086, 1103 (C.D. Cal. 2005).

ORDER – 9

information provided by the federal agency and to issue a biological opinion setting forth the terms for which the federal agency must comply. *See* 16 U.S.C. § 1536(b)(4); 50 C.F.R. § 402.14(g). In fact, several courts have held that biological assessments are not final agency actions,[4] at least in the context of the Administrative Procedures Act. *See e.g. Or. Nat'l Desert Ass'n v. Tidwell*, 716 F. Supp. 2d 982, 995 (D. Or. 2010) (citing *Or. Nat'l Res. Council v. Allen*, 476 F.3d 1031, 1035-36 (9th Cir. 2007)). In short, the Shellfish PBA is predecisional because it was prepared to advise the Services in how to prepare their PBO. The Court finds that the Corps has met its burden on this point.[5] *See* Dkt. # 15 (Bennett Decl.) ¶¶ 10-11.

Whether the Shellfish PBA is deliberative, however, remains strongly disputed. *See* Dkt. # 16 at 12. "A document is 'deliberative' if it exposes personal opinions such that releasing the document 'would expose an agency's decision-making process in such a way as to discourage candid discussion within the agency and thereby undermine the agency's ability to perform its functions.'" *Cal. Native Plant Soc'y*, 251 F.R.D. at 411 (quoting *Carter*, 307 F.3d at 1090). Accordingly, courts are instructed to "focus on the effect of the materials' release." *Carter*, 307 F.3d at 1090 (quoting *Assembly of Cal.*, 968 F.2d at 921).

---

[4] Of course, a "decision" for purposes of the FOIA is not necessarily the same as a "final agency action" under the APA. *See Cal. Native Plant Soc'y v. U.S. E.P.A.*, 251 F.R.D. 408, 412 n.2 (N.D. Cal. 2008) (citing *Judicial Watch, Inc. v. Clinton*, 880 F. Supp. 1, 13 (D.D.C. 1995)).

[5] The court in *Ctr. for Biological Diversity v. U.S. Marine Corps*, No. CIV. 00-2387 (TFH), 2005 WL 3262901, at *2 (D.D.C. Sept. 19, 2005) held that a biological assessment was not predecisional because it reflected the agency's "official position on the impact of military and other base activities on listed threatened and endangered species." The *Ctr. for Biological Diversity* court found it inconsequential "that the policy may change as a result of FWS's biological opinion does not affect the biological assessment from being Defendant's final decision at the time the assessment was given to FWS." *Id.*

This Court disagrees with that conclusion. "[A]n agency's recommendation does not cause the recommendation to lose its 'pre-decisional' status merely because it has been communicated to another agency or Executive Branch component." *Trea Senior Citizens League v. U.S. Dep't of State*, 994 F. Supp. 2d 23, 33 (D.D.C. 2013) (citing cases). This is particularly true when another agency makes the final decision, even when the recommending agency's communications are likely to frame that decision. *See Bureau of Nat'l Affairs, Inc. v. U.S. Dep't of Justice*, 742 F.2d 1484, 1497 (D.C. Cir. 1984).

ORDER – 10

1    Initially, the Pacific Growers argue that the Corps has not met its burden of
2 showing with particularity that the Shellfish PBA is deliberative. *See* Dkt. # 16 at 13.
3 But the Corps has already provided affidavits from individuals who are knowledgeable
4 about the information sought. *See* Dkt. # 15 (Bennett Decl.) ¶¶ 1-3; Dkt. # 20 (Bennett
5 Decl.) ¶¶ 1. Those affiants describe the contents (though not the particulars) of the
6 Shellfish PBA – and, more importantly, the process by which the Shellfish PBA came
7 into being – in substantial detail, allowing the Court to consider how its disclosure would
8 reveal the agency's decisionmaking process.

9    Beyond that, much of the disagreement centers on whether the Shellfish PBA
10 concerns the personal opinions of the drafters or is simply a factual document. *See* Dkt. #
11 4 at 12; Dkt. # 13 at 20. The Ninth Circuit has clarified that "[w]here either the
12 disclosure of the manner of selecting or presenting facts would expose the deliberative
13 process, or where facts are 'inextricably intertwined' with 'policy-making processes,' the
14 material is exempt." *Nat'l Wildlife Fed.*, 861 F.2d at 1119 (quoting *Ryan v. Dep't of
15 Justice*, 617 F.2d 781, 790 (D.C. Cir. 1980)). Thus, even if much of the material of the
16 Shellfish PBA is factual, those portions may still be deliberative if revealing that
17 information exposes the deliberative process. *See Martins v. U.S. Citizenship &
18 Immigration Servs.*, 962 F. Supp. 2d 1106, 1122 (N.D. Cal. 2013) (quoting *Sanchez v.
19 Johnson*, No. C-00-1593 CW (JCS), 2001 WL 1870308, at *5 (N.D. Cal. Nov. 19,
20 2001)).

21    The Pacific Growers cite *Greenpeace v. Nat'l Marine Fisheries Serv.*, 198 F.R.D.
22 540 (W.D. Wash. 2000) and *Nw. Envt'l Advocates v. U.S. E.P.A.*, No. CIV 05-1876-HA,
23 2009 WL 349732 (D. Or. Feb. 11, 2009) for the proposition that documents from ESA
24 consultations are not subject to the deliberative process privilege, but both cases are
25 easily distinguishable. *See* Dkt. # 16 at 13.

26    In *Greenpeace*, the court held that the NMFS could not withhold certain
27 documents which "were prepared by NMFS scientists and staff in connection with the
28 ORDER – 11

1  development of" reasonable and prudent alternatives under Section 7 of the ESA under
2  the deliberative process privilege because the specific "determination of jeopardy and
3  adverse modification under the ESA was not a process that implicated NMFS's policy-
4  oriented judgment." 198 F.R.D. at 542, 544.  Instead, the court determined that "[a]
5  determination of jeopardy and adverse modification under the ESA requires the agency to
6  collect scientific facts and data, and to reach expert scientific conclusions based on these
7  facts," meaning that few policy oriented judgments were implicated. *Id.* at 544.

8        The *Nw. Envt'l Advocates* court confronted an effort by the EPA, USFWS, and
9  NMFS to withhold documents related to the creation of a regional temperature guidance
10 utilized by the EPA to help it develop water quality standards. *See* 2009 WL 349732 at
11 *3.  The court disagreed with the *Greenpeace* court, holding that "documents related to
12 the § 7(a)(2) consultation process" could be deliberative, even if relatively few would
13 qualify.  *See id.* at *7.  The court noted that under the ESA, agencies are required to make
14 scientific decisions which are unlikely to expose an agency's decisionmaking process in a
15 manner likely to discourage candor within the agency.  *See id.*  As a result, the court
16 found that the "largely scientific drafts [was] unlikely to harm future agency
17 decisionmaking or to result in embarrassment to the agencies." *Id.*

18       In contrast to the largely policy-neutral documents in those cases, however, the
19 Shellfish PBA at issue relates to a *programmatic* biological assessment by the Corps.
20 Rather than making specific scientific findings related to a single permit application, the
21 Shellfish PBA (and the forthcoming PBO) covers general categories of future work
22 activities.  *See* Dkt. # 15 (Bennett Decl.) ¶ 12; Dkt. # 20 (Bennett Decl.) ¶ 3, Ex. 1.  In
23 this sense, even discussing specific facts or scientific findings may reveal internal
24 deliberative processes (and policy judgments) that reflect the categories of conduct the
25 Corps seeks to regulate and how it proposes to do so in accord with the ESA and MSA.
26 In other words, contrary to the situations in *Greenpeace* and *Nw. Envt'l Advocates*, the
27 Shellfish PBA here *is* "open to discretionary decisionmaking." *See Nw. Envt'l*
28 ORDER – 12

*Advocates*, 2009 WL 349732 at *7. As the affiants make clear, the Corps decided to undertake the consultation process because it found that a previous consultation did not cover certain activities under the 2012 version of NWP 48. *See* Dkt. # 15 (Bennett Decl.) ¶ 15. Moreover, the Seattle District of the Corps chose to pursue a new programmatic consultation to "streamline the process for the range of shellfish activity applicants" beyond those "for NWP 48," but also others. *Id.* ¶ 16. In doing so, the Corps certainly made policy determinations as to which categories of shellfish activity applications could appropriately be streamlined and which could not and reported its opinions on those activities to the Services. The inclusion or exclusion of these activity categories necessarily entails some give and take as to what types of activities may be accommodated in a programmatic manner, especially when paired with the informal participation of the Services. In fact, comparing earlier drafts of the Corps' Shellfish PBA[6] and the Corps' pronouncements on the subject matter of the Shellfish PBA suggests that priorities may have shifted during the course of internal deliberations. *Compare* Dkt. # 17-1 (DeNike Decl.) Ex. 1 *and* Dkt. # 18-1 (Carr Decl.) Ex. 1 *with* Dkt. # 20-1 (Bennett Decl.) Ex. 1.

Disclosure of the Shellfish PBA at this juncture also could expose the Services' decision making process in such a way as to discourage candid discussion and thereby undermine their ability to perform their functions. Depending on what activities the Corps seeks to cover under the Shellfish PBA, the Services necessarily must provide an opinion on the proposed activities. *See* 16 U.S.C. § 1536(b)(4). In this sense, revealing the proposed activities themselves will tip the Services' hand as to how they reach their opinions. *See Mobil Oil Corp. v. U.S. E.P.A.*, 879 F.2d 698, 703 (9th Cir. 1989) (citing *Exxon Corp. v. Dep't of Energy*, 585 F. Supp. 690, 698 (D.D.C. 1983)) (noting that the effect of requiring an agency to show the difference between how a draft differs from the

---

[6] The Pacific Growers have not detailed the provenance of the filed December 2014 PBA. *See* Dkt. # 18 (Carr Decl.) ¶ 4. Nevertheless, the Corps does not dispute its authenticity. *See* Dkt. # 20 (Bennett Decl.) ¶ 18.

ORDER – 13

final document to claim the deliberative process privilege "would be to expose what occurred in the deliberative process between the draft's creation and the final document's issuance").

Still, the Pacific Growers argue that the ESA consultation process expressly contemplates its (and its members') participation as "applicants," contending that the consultative process is not as secret as the Corps claims.[7] *See* Dkt. # 16 at 16-17. But the Pacific Growers ignore "that FOIA does not permit selective disclosure of information only to certain parties." *Maricopa Audobon*, 108 F.3d at 1088. Instead, "the identity of the requesting party has no bearing on the merits of his or her FOIA request." *U.S. Dep't of Justice v. Reporters Comm. for Freedom of Press*, 489 U.S. 749, 772 (1989). Indeed, whether the Pacific Growers or its members have other rights of access to the Shellfish PBA is irrelevant to the Court's FOIA inquiry. *See Yonemoto*, 686 F.3d at 689 (distinguishing between agency's offer of documents to applicant in his capacity as an employee and public, unrestricted access provided by FOIA); *Spurlock v. F.B.I.*, 69 F.3d 1010, 1015-16 (9th Cir. 1995) (noting that the FOIA analysis generally ends once the court determines whether an exemption applies); *see also* 5 U.S.C. § 552(a)(4)(B).

Furthermore, the regulations and the Services' ESA Section 7 Consultation Handbook strongly suggest that the Pacific Growers (and its members) are not "applicants" to a programmatic consultation. The comments to the rulemaking clarify that the Services have taken the position that "prospective permit applicants" are not "applicants." *See* Interagency Cooperation—Endangered Species Act of 1973, as Amended; Final Rule, 51 Fed. Reg. 19,930 (June 3, 1986) (to be codified at 7 C.F.R. pt. 402) ("One commenter suggested that the definition of applicant be amended to allow prospective permit applicants to participate in section 7 consultations"). Likewise, the Services' handbook on ESA consultations reiterates that "[u]sers of public resources

---

[7] Somewhat ironically, the Pacific Growers argue that the Corps waived the deliberative process for disclosing portions of older drafts of the Shellfish PBA with various Indian Tribes.

ORDER – 14

1  (e.g., timber companies harvesting on National Forests) *are not parties to programmatic section 7 consultations dealing with an agency's overall management operations*, including land management planning and other program level consultations." *See* U.S. Fish & Wildlife Serv. & Nat. Marine Fisheries Serv., *Endangered Species Consultation Handbook: Procedures for Conducting Consultation and Conference Activities under Section 7 of the Endangered Species Act* 2-12 (1998) (emphasis added). [8]

b. <u>Whether the Corps Waived Exemption 5</u>

Having found that the deliberative process – and Exemption 5 – may apply to the Shellfish PBA, the Court turns to the question of whether the Corps nevertheless waived the exemption because previous drafts of the PBA have been disclosed to third parties. *See* Dkt. # 16 at 18.

The Parties do not seriously dispute that portions of the December 2014 draft of the Shellfish PBA were disclosed. *See* Dkt. # 20 (Bennett Decl.) ¶¶ 16-19. Portions of the September and December 2014 drafts were shared with various Indian Tribes, the Northwest Indian Fisheries Commission, and the EPA. *See id.* ¶¶ 15, 17. Moreover, the Corps admits that an unauthorized release of the December 2014 draft of the Shellfish PBA occurred. *See id.* ¶ 18. Still, the current draft of the Shellfish PBA has never been released outside of the Corps and the Services. *Id.* ¶ 19.

"Voluntary disclosure of documents, either in whole or in part, to third parties has sometimes been held to waive FOIA exemptions for those documents." *Mobil Oil*, 879 F.2d at 700 (citing cases); *AIDS Healthcare Found. v. United States Food & Drug Admin.*, No. CV1107925MMMJEMX, 2014 WL 10983763, at *7 (C.D. Cal. Feb. 13, 2014). However, "release of certain documents waives FOIA exemptions *only for those*

---

[8] The Pacific Growers' invective on this point (*see* Dkt. # 22 at 3) is not well taken. The current programmatic consultation certainly was intended to cover pending permit applications, including by Pacific Grower members. *See* Dkt. # 15 (Bennett Decl.) ¶ 15. But the *pending* permit applicants are far closer to general users of public resources than to individuals who have *already successfully obtained licenses*. *Cf. Hawaii Longline Ass'n v. Nat'l Marine Fisheries Serv.*, No. CIV.A.01-765(CKK/JMF, 2002 WL 732363, at *8 (D.D.C. Apr. 25, 2002).

ORDER – 15

*documents released*" and the burden is generally on the requester to show that the withheld information has been specifically revealed to the public and that a duplicate is being withheld. *See id.* (quoting *U.S. Student Ass'n v. CIA*, 620 F. Supp. 2d 565, 571 (D.D.C. 1985)); *see also Wulf v. C.I.A.*, 473 F.3d 370, 378 (D.C. Cir. 2007) (quoting *Afshar v. Dep't of State*, 702 F.2d 1125, 1130 (D.C. Cir. 1983)) (holding that an agency could waive FOIA exemptions if it officially acknowledged the existence of those records, but that a plaintiff asserting prior disclosure bore the "burden of pointing to specific information in the public domain that appears to duplicate that being withheld").[9]

To be sure, there is no "Indian trust" exemption in the FOIA. *See Klamath Water*, 532 U.S. at 15-16. And, accordingly, it would appear that the portions of the September and December 2014 drafts which were voluntarily released by the Corps would not fall under Exemption 5. But the voluntary disclosure of those drafts does not *per se* waive the privilege as to the October 2015 draft at issue here. Waiver of a FOIA exemption as to one document does not extend to other documents. *See Mobil Oil*, 879 F.2d at 701. And it is undisputed that the Corps has never revealed the October 2015 Shellfish PBA to any non-governmental entity. *See* Dkt. # 20 (Bennett Decl.) ¶ 19. As a result, the Court finds that the Corps has not waived Exemption 5 as to the whole October 2015 Shellfish PBA. Moreover, should the Corps reveal the mere differences between the prior drafts and the current draft of the Shellfish PBA, it likely will expose the internal deliberations undertaken to create the October 2015 draft. *Id.* at 703.

c. <u>Whether the Corps Must Disclose Portions of the Shellfish PBA</u>

One final point merits mention. A district court must make a segregability determination when it approves the withholding of a document, though it need not

---

[9] *Nat. Res. Def. Council v. U.S. Dep't of Def.*, 442 F. Supp. 2d 857, 865-66 (C.D. Cal. 2006) is largely in accord. The court there held that the Office of Management and Budget waived the deliberative process privilege when it did not take efforts to limit a non-government lobbying entity's dissemination of the two specific letters at issue, but also actively discussed the content of the letters with the group. *Id.* Crucially, the court did not rely on the fact that the documents were leaked to find waiver. *Id.* (finding that the agency's conduct with the third party following the purported leak was sufficient in and of itself to waive Exemption 5).

ORDER – 16

necessarily conduct a document-by-document (or sentence-by-sentence as the Pacific Growers would have it) review. *See Hamdan*, 797 F.3d at 779.

As the Pacific Growers rightly note, "[a]n agency may withhold only that information to which the exemption applies, and so must provide all 'reasonably segregable' portions of that record to the requester." *Yonemoto*, 686 F.3d at 688 (quoting 5 U.S.C. § 552(b)). The agency bears the burden in showing that all reasonably segregable portions of each document have been disclosed and an agency can meet that "by providing the district court with a reasonably detailed description of the withheld material and 'alleging facts sufficient to establish an exemption.'" *Hamdan*, 797 F.3d at 779 (quoting *Pac. Fisheries*, 539 F.3d at 1148). "[A] blanket declaration that all facts are so intertwined to prevent disclosure under the FOIA does not constitute a sufficient explanation of non-segregability." *Wilderness Soc. v. U.S. Dep't of Interior*, 344 F. Supp. 2d 1, 19 (D.D.C. 2004) (citing *Animal Legal Def. Fund, Inc. v. Dep't of Air Force*, 44 F. Supp. 2d 295, 301-02 (D.D.C. 1999)).

The Pacific Growers argue that the Corps has not met its burden in showing that all reasonably segregable portions of the October 2015 Shellfish PBA have been disclosed. *See* Dkt. # 16 at 22-23. The Corps argues that it cannot do so because all material – even purely factual material – in the current Shellfish PBA is inextricably intertwined with deliberative material. *See* Dkt. # 13 at 20.

The Court notes that the Corps has provided a reasonably detailed description of the Shellfish PBA. *See* Dkt. # 15 (Bennett Decl.) ¶¶ 16-17; Dkt. # 20 (Bennett Decl.) ¶ 3. It has also emphasized the necessity of withholding the entirety of the Shellfish PBA to preserve – functionally the entirety of the briefing is directed at the same point: disclosure of any portion of the Shellfish PBA is likely to reveal the inner deliberations of the Corps and the Services in completing the consultation process and issuing a PBO. This makes sense – given the nature of the Shellfish PBA (and as readily revealed by reviewing the September and December 2014 drafts), the factual material itself reveals the relative

ORDER – 17

policy priorities the Corps (and perhaps the Services) are advancing in an effort to streamline prospective permit applications.

As a result, the Court finds that the Corps has met its burden in showing that it has released all reasonably segregable portions of the Shellfish PBA.

## V.   CONCLUSION

For the foregoing reasons, the Court **DENIES** the Pacific Growers' cross-motion for summary judgment (Dkt. # 4) and **GRANTS** the Corps' cross-motion for summary judgment (Dkt. # 13).

The Court recognizes that the Pacific Growers are entitled to the factual material contained in the Shellfish PBA. In fact, the Corps concedes as much and has acknowledged that the ultimate version of the Shellfish PBA will likely become available to the public after the completion of the Services' consultation process and issuance of the PBO. However, the Pacific Growers' current request is premature and the time for disclosure of the Shellfish PBA has yet to arrive.

DATED this 24th day of May, 2016.

The Honorable Richard A. Jones
United States District Judge

ORDER – 18